No. 124,054

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellee*,

v.

MARK SCHEETZ,
*Appellant*.

SYLLABUS BY THE COURT

1.

The term "presence" in the statutory definition of the crime of lewd and lascivious behavior, under K.S.A. 2021 Supp. 21-5513(a)(2), requires exposure of a sex organ within another's physical presence, so the digital transmission of a picture of a sex organ to another would not qualify.

2.

K.S.A. 2021 Supp. 60-455(g) provides an exclusive listing of the acts or offenses which constitute an "'act or offense of sexual misconduct'" as that term is used in K.S.A. 2021 Supp. 60-455(d). Therefore, evidence of the defendant's commission of another act or offense of sexual misconduct must satisfy subsection (g)'s definition before it can be admissible under subsection (d).

Appeal from Norton District Court; PRESTON PRATT, judge. Opinion filed January 13, 2023. Reversed and remanded with directions.

*Jacob Nowak*, of Kansas Appellate Defender Office, for appellant.

*Steven J. Obermeier*, assistant solicitor general, and *Derek Schmidt*, attorney general, for appellee.

Before CLINE, P.J., ATCHESON and COBLE, JJ.

CLINE, J.: Mark Scheetz challenges several sex crime convictions based on the improper admission of evidence under K.S.A. 2021 Supp. 60-455(d) and prosecutorial error in closing arguments. Because we find the cumulative effect of trial errors prejudiced Scheetz' ability to have a fair trial, we reverse his convictions and remand for a new trial.

FACTS

Scheetz was charged in Norton County District Court with two counts of aggravated criminal sodomy, two counts of rape, one count of sexual exploitation of a child, and one count of intimidation of a witness or victim. These charges arose out of Scheetz' alleged conduct with M.C., the daughter of Scheetz' girlfriend. M.C. was under the age of 14 when the alleged offenses occurred, which was between December 2012 and September 2015.

*Pretrial K.S.A. 60-455 hearing*

In cases involving certain sex offenses, such as this one, "evidence of the defendant's commission of another act or offense of sexual misconduct is admissible, and may be considered for its bearing on any matter to which it is relevant and probative." K.S.A. 2021 Supp. 60-455(d). Such evidence of a defendant's other crimes and civil wrongs is commonly known as "propensity evidence."

The State moved in limine under K.S.A. 2021 Supp. 60-455(d) to admit evidence at trial of Scheetz' interactions with three other girls as well as evidence allegedly obtained from his internet search history on several electronic devices. This propensity evidence included: (1) evidence that Scheetz sent an image of his penis to G.H. over

Snapchat; (2) evidence that Scheetz invited H.T. to "hang out" with him at his hotel room in exchange for alcohol and sent H.T. several pictures of his penis over Snapchat; (3) evidence that Scheetz asked C.K. to send him nude images of herself over Snapchat and when she refused, Scheetz sent her a nude picture of himself; and (4) internet searches for adult pornographic videos which portrayed "incestual-type" situations. The State argued Scheetz' actions qualified as acts or offenses of sexual misconduct under K.S.A. 2021 Supp. 60-455(d) and sought admission of the evidence to show Scheetz' propensity to commit the sexual offenses with which he was charged.

At the hearing on the State's motion, the district court heard testimony from several witnesses about Scheetz' alleged sexual misconduct.

The first witness, 13-year-old G.H., knew Scheetz as a family friend who worked for her father. She testified that she and Scheetz often communicated over Snapchat and these messages were always innocuous, such as wishing her "good luck" on game days. But once, when she was 12, Scheetz sent her "a picture of his private area." After Scheetz sent the picture, she claimed he sent her messages saying it was an accident and asking her not to tell her father.

M.C.'s 17-year-old friend H.T. testified next. She met Scheetz through spending time with M.C. She and Scheetz exchanged messages for a time on social media, mostly through Snapchat. She described the messages as innocent at first but eventually Scheetz sent her two "male-part pictures," at which point she blocked him. H.T. testified that on another occasion, Scheetz offered to buy her alcohol if she would come to a hotel where he was staying, and he also offered to give her gas money if she would hang out with him.

The next witness, C.K., met Scheetz through her uncle when she was 16. She also exchanged Snapchat messages with Scheetz but not until after he moved away from

town. She said at first he responded to pictures she posted on her account with complimentary emojis but eventually he asked her to send him nude pictures. She refused this request twice and sometime later Scheetz sent her an unsolicited nude picture of himself in the mirror.

Finally, Special Agent Nicholas Krug of the Kansas Bureau of Investigation (KBI) testified about his analysis of four iPhones belonging to Scheetz, which had been seized and searched under a warrant. Agent Krug said he managed to retrieve Scheetz' internet search history on the devices, which Krug claimed included searches for "incestual pornography, specifically, stepfather-stepdaughter type searches." No one claimed any of these searches included child pornography.

The State argued the proffered evidence showed a pattern of Scheetz targeting minor females over Snapchat and then sending them nude pictures of himself. The State claimed this evidence showed Scheetz had a propensity for sexual contact with underage females.

Scheetz addressed each piece of evidence in turn. He first argued G.H.'s testimony was "very non-specific" and claimed he sent the picture to her by mistake. He also pointed out that H.T. admitted he never asked her to send him pictures and his offers of gas and alcohol did not "indicate any kind of sexual content or any kind of sexual behavior on the part of [Scheetz or H.T.]." As to C.K.'s testimony and his internet search history, Scheetz argued this evidence was inadmissible since the alleged conduct occurred after the charged crimes were alleged to have occurred, and thus were not *prior* bad acts but later ones.

The district court found all the evidence offered by the State relevant and probative to Scheetz' charged crimes and granted the State's motion. It also pointed out that while the phrase "prior bad acts" is often used as shorthand for the sort of evidence

4

admitted under K.S.A. 2021 Supp. 60-455, the statute does not require evidence of a defendant's other crimes or civil wrongs to be *prior* crimes or civil wrongs.

*Trial*

The State detailed the propensity evidence it intended to present in its opening statement. And it began its case by calling B.C.—G.H.'s father and C.K.'s uncle—to the stand. B.C. discussed G.H.'s text messages to him after receiving the picture from Scheetz, and those messages were admitted as an exhibit and published to the jury. B.C. also testified about later learning Scheetz had sent inappropriate pictures to C.K. as well. B.C. described how he eventually learned from Norton Police Assistant Chief Jody Enfield that Scheetz was being investigated in connection with an allegation of electronic solicitation. After discussing what Enfield told him with a colleague, B.C. decided to contact the KBI about what he knew.

The jury next heard testimony from G.H. She testified that one night when she was babysitting she received a Snapchat from Scheetz of his penis. She said the photo accompanied a text that read "something along the lines of waiting for you to come over." Scheetz immediately messaged her, asking her not to tell her dad and apologizing for "scarring [her]." Other than this incident, which G.H. believed was an accident, G.H. testified Scheetz never acted inappropriately towards her.

Sheridan County Undersheriff Brian Diercks, who took G.H.'s initial statement, testified next. He said he and B.C. first brushed off the incident as an accident, assuming Scheetz had intended to send the picture to a girlfriend and sent it to G.H. by mistake. They based this conclusion on the way that Snapchat suggests potential recipients for messages according to who you have interacted with recently. He then explained that he and B.C. decided to contact the KBI after learning Scheetz was under suspicion for

5

sending inappropriate Snapchats to a 16-year-old girl. They thought perhaps the picture sent to G.H. was meant for this other girl.

KBI Officer Mark Kendrick, who interviewed G.H. about the picture she received from Scheetz, also testified. He said G.H. suggested that Scheetz reacted as if he sent the picture to her by accident, based on the messages Scheetz sent with and after the picture.

After calling those four witnesses to describe the incident with G.H., the State then called H.T., C.K., C.K.'s mother, and a law enforcement officer who had interviewed H.T. The testimony from H.T. and C.K. tracked their testimony at the hearing on the State's K.S.A. 60-455 motion. C.K.'s mother testified that C.K. told her Scheetz had asked her for nudes and sent her nude pictures of himself. And the officer explained he learned about Scheetz' communications with H.T. when he was interviewing H.T. about a possible relationship between her and another law enforcement officer with the Norton Police Department.

The State admitted records of Scheetz' Snapchat messages with C.K., G.H., and H.T. and his Facebook messages with C.K. into evidence. It also admitted records of his internet search history. Scheetz timely renewed his objections to the admissibility of the propensity evidence. As to the search history, he further argued there was no evidence he watched child pornography and nothing in the search history was illegal.

After all this propensity evidence, the jury finally heard from the alleged victim, M.C. She was 19 when she testified.

M.C. identified Scheetz as her mother's ex-boyfriend. When they started dating, M.C. and her mother lived with her grandfather. But around the time she was 11, they moved into their own place and Scheetz moved in with them. M.C. said living with her mother was "hell." She described her mother as an angry drunk, who would often kick

6

her out of the house. She denied having much contact with her biological father at that point in her life. She said Scheetz was the one in the house who was really taking care of her and she saw him as a father figure.

M.C. testified that at some point she noticed Scheetz began lifting her shirt and rubbing her back and stomach at times while she was sleeping. She said one night he picked her up after she had gotten into a fight with her mother and ran away. They spent the night at her grandfather's house, away from her mother. Scheetz comforted M.C. while her grandfather slept. At some point, Scheetz removed his penis from his shorts and persuaded her to give him oral sex.

M.C. also described another incident when Scheetz took her bird hunting. She said while they were sitting in the truck, Scheetz digitally penetrated her vagina and took videos of himself doing so. She explained that Scheetz kept videos of her in a photo vault application on his phone. M.C. testified she was 12 and Scheetz was 24 when these events occurred.

M.C. detailed another encounter with Scheetz when she was 13, during which they had sex at her mother's house while her mother was gone. And she testified Scheetz performed oral sex on her a different time.

M.C. eventually moved out of her mother's house when she was 13 and began living with her biological father in another town. She had very little contact with Scheetz at that point and they never saw each other in person. But she admitted sending Scheetz pictures over Snapchat after moving in with her father. M.C. said she never told anyone about Scheetz' actions until she found out KBI agents were looking for her.

The State admitted into evidence photographs recovered from a phone found in Scheetz' possession. These photographs were found in a photo vault application on the

7

phone that was password protected. Among these photographs were several pictures of unclothed females whose faces were not visible. M.C. identified herself in all these photographs, noting such identifying features as a scar on her hand, the naval piercing in several of the photos, and the bedding visible in the background.

The State also admitted into evidence a Crown Royal bag found in Scheetz' bedroom containing six pairs of women's underwear. M.C. testified that Scheetz told her he took a pair of her underwear, but she did not recognize any of these as hers.

Lisa Burdett, a forensic scientist with the KBI, testified about the DNA analysis she performed on several pairs of the underwear. The samples taken from the underwear were compared against DNA samples taken from M.C., M.C.'s mother, and Scheetz. DNA testing of one of the pairs of underwear revealed a major profile matching Scheetz. The partial minor profile obtained from the underwear matched M.C. but was not consistent with her mother.

The State also admitted into evidence a letter Scheetz tried to send to his brother from jail that was screened and intercepted by the Norton County Sheriff's Office. Scheetz' letter to his brother contained a separate letter addressed to M.C. that purported to be from an anonymous woman in her community. The letter reminded M.C. of the positive aspects of her relationship with Scheetz and the potential embarrassment of a trial for her and pleaded with her to change her story. In the letter to his brother, Scheetz asked his brother to mail the enclosed letter and follow up with M.C. to make sure she got it.

Scheetz testified in his own defense. He first outlined the progression of his relationship with M.C.'s mother. Scheetz testified that M.C.'s mother was a recovering alcoholic when they moved in together. He said their relationship was good at first, but eventually M.C.'s mother began drinking again and things deteriorated in the household.

This included M.C.'s relationship with her mother, which became very contentious and violent at times. During this period, Scheetz would often leave the house and stay with his own mother, either by choice or because M.C.'s mother had kicked him out during a fight.

Scheetz denied M.C.'s allegations of sexual abuse. He testified that on the night of M.C.'s first allegation, he was living with his mother. M.C.'s mother called and told him M.C. had run away, so he agreed to look for her. His sister-in-law went with him. While they were out looking, they received a call from his mother that M.C. had shown up at Scheetz' mother's house. The police arrived and M.C. went to spend the night at her grandfather's, since she did not want to go back to her own home and confront her mother. A little while later, Scheetz received a call from M.C.'s grandfather, who said M.C. would not stop crying and was refusing to talk to him. M.C.'s grandfather asked Scheetz to come over and see if he could calm her down.

Scheetz said when he arrived, M.C. was in her grandfather's bedroom by herself, despondent. He went into the room and sat on the bed with her with the door open and M.C.'s grandfather in the other room. After they talked for a while, M.C. eventually calmed down. She laid her head on his shoulder and they watched television. He denied anything sexual happened between them. He said he left after about two hours and went back to his mother's, and M.C.'s grandfather was awake when he left.

Scheetz also denied M.C.'s other allegations of sexual encounters. As for the women's underwear found in his house, he claimed they were from M.C.'s mother and other women. He explained that after his first sexual experience in junior high, the girl gave him a pair of her underwear as a keepsake. He has since kept underwear from many women he has been involved with.

9

Scheetz did not discuss the pictures found on his phone or the letters to M.C. and his brother, nor did the State cross-examine him about these topics. Scheetz was also not questioned about any of the propensity evidence.

Aside from his own testimony, Scheetz called several witnesses who had spent time around him and M.C. They all generally testified they had not seen or heard anything which caused them concern that M.C. was being sexually abused.

The State emphasized the propensity evidence again in closing, using it to discredit Scheetz' denial of M.C.'s allegations. And in its rebuttal closing, the State even recited the titles of some of the pornographic videos it claimed had been found in Scheetz' internet search history to establish Scheetz' alleged sexual interest in young girls, including M.C.:

> "If you look at State's Exhibit 122, it's an entire spreadsheet where it has a lot of different sites that have been visited or searches. A portion of that is on, it's listed on the far left-hand side by number and then it has specific pages. Just a portion of what the defendant is searching for on his phone that the defense tried to characterize to you as, oh, he just looked at some porn, it's not a big deal. He's looking at Dad's Dick, Raw Confessions; Daughter Flirts With Me, Raw Confessions; My Stepdad Finally Touched Me, Raw Confessions. He's looking at, Sleeping with Stepdad, Horny for my Stepdaughter, My Dad Slid his Finger Down There, Stepdad Started Blowing Me at Age Five, Does Any Father Here Jack Off Thinking About Your Daughter, Dad Fucks Sleeping Stepdaughter, Daughter Belongs to Daddy, Free Little Stepdaughter Porn Videos, Little Stepdaughter Porn Videos, and Took my Stepdaughter's Virginity.
> "If you have any question in your mind what he's interested in, this should answer that question for you. It's not a case of [M.C.] said it and he said. It's a case of [M.C.] said he spent the night there, and his Facebook records confirm that. It's a case of he's talking to other underage girls, and he's sending them nude pictures of his erect penis, on accident, for [G.H.]. And he just denies that it happened with [C.K.] and [H.T.] at all. But they both told you what they saw.

"And when you take all of that into consideration along with the DNA results, along with his Snapchat records, along with the internet searches, you get a really clear picture of what happened."

The jury convicted Scheetz on all counts and the district court sentenced Scheetz to life in prison without the possibility of parole for 50 years.

ANALYSIS

*Did the district court err in admitting propensity evidence under K.S.A. 2021 Supp. 60-455(d)?*

Scheetz first argues the district court erred by admitting evidence under K.S.A. 2021 Supp. 60-455(d) that did not meet the definition of sexual misconduct provided in K.S.A. 2021 Supp. 60-455(g). He claims none of the State's propensity evidence should have been admitted since it all falls outside this definition.

To begin, the State urges us not to consider Scheetz' claim, arguing that he failed to properly preserve this argument for appellate review. While it concedes that Scheetz objected to admission of the propensity evidence below, the State claims he never raised this specific argument before the district court by referencing K.S.A. 2021 Supp. 60-455(g) in his trial objections.

Scheetz, on the other hand, contends his objections below were enough to preserve his arguments for review, since he satisfied the form and function of the contemporaneous objection rule by objecting at all appropriate times to the admission of this propensity evidence under K.S.A. 2021 Supp. 60-455(d).

K.S.A. 60-404 requires a timely and specific objection to the admission of evidence before a verdict can be set aside based on the erroneous admission of such

11

evidence. *State v. King*, 288 Kan. 333, 348, 204 P.3d 585 (2009). Our Supreme Court has determined this rule aims to give the district court "'the opportunity to conduct the trial without using . . . tainted evidence, and thus avoid possible reversal and a new trial.'" 288 Kan. at 342 (quoting *Baker v. State*, 204 Kan. 607, 611, 464 P.2d 212 [1970]).

Scheetz actively litigated the admissibility of this evidence under K.S.A. 2021 Supp. 60-455(d) both before and during trial. As he points out in his reply brief, the State moved to admit the propensity evidence under subsection (d) and Scheetz disputed the application of that subsection. Although he did not specifically mention K.S.A. 2021 Supp. 60-455(g), the general theme underlying his objections was that so long as he was not soliciting underage girls for sex or watching child pornography, his conduct was not admissible as propensity evidence under K.S.A. 2021 Supp. 60-455(d). That is, Scheetz argued the propensity evidence did not establish that he committed any crimes involving the other girls or his alleged internet search history. Aside from subsections (g)(6)-(8), which list specific acts of sexual misconduct inapplicable here, all offenses of sexual misconduct listed in K.S.A. 2021 Supp. 60-455(g) are crimes. So Scheetz' argument on appeal is not altogether different from what he argued below. See 2021 Supp. K.S.A. 60-455(g)(1), (9).

The State argues we should find Scheetz' objection unpreserved under *State v. Bliss*, 61 Kan. App. 2d 76, 97-102, 498 P.3d 1220 (2021). But we find the State's reliance on *Bliss* to be misplaced. In *Bliss*, we held that a defendant's ambiguous objection for "'the record'" could not preserve his claim for review, since it did not identify the rule the objection was based on. 61 Kan. App. 2d at 101. Unlike that case, however, Scheetz' objection was much more specific. We therefore find the purpose of K.S.A. 60-404 was fulfilled, and Scheetz has preserved his claim for review.

Now, we must turn to an analysis of the district court's admission of this evidence. Since the court's decision hinges on its interpretation of K.S.A. 2021 Supp. 60-455, we

are presented with a question of law over which we have unlimited review. *State v. Miller*, 308 Kan. 1119, 1166, 427 P.3d 907 (2018).

*Admission of propensity evidence under K.S.A. 60-455*

K.S.A. 2021 Supp. 60-455 governs the admissibility of propensity evidence. It generally bars the use of such evidence "to prove such person's disposition to commit crime or civil wrong as the basis for an inference that the person committed another crime or civil wrong on another specified occasion." K.S.A. 2021 Supp. 60-455(a). The Legislature carved out two exceptions to this prohibition. Subsection (b) allows the admission of propensity evidence "when relevant to prove some other material fact including motive, opportunity, intent, preparation, plan, knowledge, identity or absence of mistake or accident." K.S.A. 2021 Supp. 60-455(b). And in cases involving certain sex offenses, "evidence of the defendant's commission of another act or offense of sexual misconduct is admissible, and may be considered for its bearing on any matter to which it is relevant and probative." K.S.A. 2021 Supp. 60-455(d).

The scope of the potential evidence that may be admitted under subsection (d) is limited, though, by the statute's definition of what constitutes an "act or offense of sexual misconduct":

"(g) . . . [A]n 'act or offense of sexual misconduct' includes:
(1) Any conduct proscribed by article 35 of chapter 21 of the Kansas Statutes Annotated, prior to their repeal, or article 55 of chapter 21 of the Kansas Statutes Annotated, or K.S.A. 2021 Supp. 21-6419 through 21-6422, and amendments thereto;
(2) the sexual gratification component of aggravated human trafficking, as described in K.S.A. 21-3447(a)(1)(B) or (a)(2), prior to its repeal, or K.S.A. 2021 Supp. 21-5426(b)(1)(B) or (b)(2), and amendments thereto;
(3) exposing another to a life threatening communicable disease, as described in K.S.A. 21-3435(a)(1), prior to its repeal, or K.S.A. 2021 Supp. 21-5424(a)(1), and amendments thereto;

13

(4) incest, as described in K.S.A. 21-3602, prior to its repeal, or K.S.A. 2021 Supp. 21-5604(a), and amendments thereto;

(5) aggravated incest, as described in K.S.A. 21-3603, prior to its repeal, or K.S.A. 2021 Supp. 21-5604(b), and amendments thereto;

(6) contact, without consent, between any part of the defendant's body or an object and the genitals, mouth or anus of the victim;

(7) contact, without consent, between the genitals, mouth or anus of the defendant and any part of the victim's body;

(8) deriving sexual pleasure or gratification from the infliction of death, bodily injury or physical pain to the victim;

(9) an attempt, solicitation or conspiracy to engage in conduct described in paragraphs (1) through (8); or

(10) any federal or other state conviction of an offense, or any violation of a city ordinance or county resolution, that would constitute an offense under article 35 of chapter 21 of the Kansas Statutes Annotated, prior to their repeal, or article 55 of chapter 21 of the Kansas Statutes Annotated, or K.S.A. 2021 Supp. 21-6419 through 21-6422, and amendments thereto, the sexual gratification component of aggravated human trafficking, as described in K.S.A. 21-3447(a)(1)(B) or (a)(2), prior to its repeal, or K.S.A. 2021 Supp. 21-5426(b)(1)(B) or (b)(2), and amendments thereto; incest, as described in K.S.A. 21-3602, prior to its repeal, or K.S.A. 2021 Supp. 21-5604(a), and amendments thereto; or aggravated incest, as described in K.S.A. 21-3603, prior to its repeal, or K.S.A. 2021 Supp. 21-5604(b), and amendments thereto, or involved conduct described in paragraphs (6) through (9)." K.S.A. 2021 Supp. 60-455(g).

Scheetz argues the propensity evidence admitted at trial did not meet the definition of an "act or offense of sexual misconduct" and was therefore not admissible under K.S.A. 2021 Supp. 60-455(d). He claims the evidence should have been barred under K.S.A. 2021 Supp. 60-455(a)'s general prohibition against propensity evidence.

14

*Whether Scheetz' conduct falls within the definition in K.S.A. 2021 Supp. 60-455(g)*

The district court relied on K.S.A. 2021 Supp. 60-455(d) when admitting the propensity evidence but did not reference K.S.A. 2021 Supp. 60-455(g) in making this ruling or identify which subsection it believed the evidence fell under. Neither did the State when seeking to admit the evidence.

On appeal, the only conduct which the State argues falls within the definitional listing in subsection (g) is Scheetz' transmission of nude photos to G.H., H.T., and C.K. It argues this conduct could constitute lewd and lascivious behavior under K.S.A. 2021 Supp. 21-5513. The State also claims his transmission of a nude photo to G.H. could constitute electronic solicitation under K.S.A. 2021 Supp. 21-5509.

Scheetz, for his part, agrees these offenses are in subsection (g)'s definition. But he argues the digital transmission of nude pictures to minors does not meet the statutory definition of either of those offenses. Instead, he claims this conduct is criminalized as promoting obscenity to minors under K.S.A. 2021 Supp. 21-6401, which is not among the crimes listed in K.S.A. 2021 Supp. 60-455(g).

*Lewd and Lascivious Behavior*

K.S.A. 2021 Supp. 21-5513, in relevant part, criminalizes the act of "publicly exposing a sex organ or exposing a sex organ in the presence of a person who is not the spouse of the offender and who has not consented thereto."

As Scheetz notes, the Kansas Supreme Court has interpreted the term "presence" under the predecessor statute to K.S.A. 21-5513, which used identical language in defining the crime of lewd and lascivious behavior. There, the court interpreted the term as including

15

"'the fact or condition of being present:  the state of being in one place and not elsewhere:  the condition of being within sight or call, at hand, or in a place thought of:  the fact of being in company, attendance, or association:  the state of being in front of or in the same place as someone or something:  the part of space within one's ken [range of perception], call, or influence:  the vicinity of or the area immediately near one:  the place in front of or around a person.' . . . [and] . . . '[t]he state or fact of being in a particular place and time:  [c]lose physical proximity coupled with awareness.' [Citations omitted.]" *State v. Bryan*, 281 Kan. 157, 160, 130 P.3d 85 (2006).

As Scheetz points out, these definitions all imply that physical proximity is a requirement of lewd and lascivious behavior, meaning the digital transmission of a picture would not qualify. Furthermore, since the Legislature separately criminalized the digital transmission of obscene material in K.S.A. 21-6401 (whose broad definition of "obscene material" would include a Snapchat picture of one's genitalia), it apparently intended to distinguish between exposure of one's genitalia in the physical presence of another and the digital transmission of a picture of the same. We therefore do not find that Scheetz' alleged digital transmission of nude pictures qualified as lewd and lascivious behavior, as that crime is statutorily defined.

*Electronic Solicitation*

K.S.A. 2021 Supp. 21-5509(a) defines electronic solicitation as "enticing or soliciting a person, whom the offender believes to be a child, to commit or submit to an unlawful sexual act [by means of communication conducted through the telephone, internet or by other electronic means]."

K.S.A. 2021 Supp. 21-5501(d) defines an "'[u]nlawful sexual act'" as "any rape, indecent liberties with a child, aggravated indecent liberties with a child, criminal sodomy, aggravated criminal sodomy, lewd and lascivious behavior, sexual battery or aggravated sexual battery, as defined [under Kansas law]."

16

Electronic solicitation is a severity level 3 person felony if the offender believes the person to be a child 14 or more years old but less than 16 years old and a severity level 1 person felony if the offender believes the person to be a child under 14 years old. K.S.A. 2021 Supp. 21-5509(b).

As with the offense of lewd and lascivious conduct, the State fails to explain why it believes Scheetz' conduct qualifies as electronic solicitation. It simply states: "The Snapchat could have been a precursor to any of those offenses." While Scheetz' claim that the State has insufficiently briefed this argument has some merit, in any case, the facts do not support a conclusion that Scheetz tried to solicit G.H. to commit an unlawful sexual act. And as the State tacitly admits by only addressing Scheetz' conduct towards G.H., his conduct towards H.T. and C.K. would not qualify since both girls testified they were at least 16 years old at the time.

First, all the witnesses who addressed Scheetz' conduct towards G.H. testified they believed Scheetz sent the photo to G.H. by accident, given the texts that accompanied the photo and immediately followed it. Second, even though a reasonable fact-finder might be able to infer that Scheetz sent the picture intentionally, the immediate follow up messages and G.H.'s response make it difficult to conclude that this conduct rose to the level of solicitation. Scheetz did nothing, besides sending the picture, that could be construed as attempting to entice or solicit G.H. to engage in an unlawful sexual act. Instead, he tried to convince her that he sent the picture by accident. With no other attempt to entice or solicit the recipient, we find the apparent accidental transmission of a nude picture—by itself—does not qualify as electronic solicitation. Rather, we find it more likely that the Legislature intended such conduct to be criminalized as promoting obscenity to minors.

17

*Promoting Obscenity to Minors*

Scheetz argues that his alleged transmission of nude pictures to G.H., H.T., and C.K. qualified as promoting obscenity to minors, a crime not in the list of offenses in K.S.A. 2021 Supp. 60-455(g)'s definition of an "act or offense of sexual misconduct."

K.S.A. 2021 Supp. 21-6401(b) defines the crime of promoting obscenity to minors as "promoting obscenity, . . . where a recipient of the obscene material . . . is a child under the age of 18 years." "Promoting obscenity" is defined as "[m]anufacturing, mailing, transmitting, publishing, distributing, presenting, exhibiting or advertising any obscene material." K.S.A. 2021 Supp. 21-6401(a)(1). "'[M]aterial'" is defined as "any tangible thing which is capable of being used or adapted to arouse interest, whether through the medium of reading, observation, sound or other manner." K.S.A. 2021 Supp. 21-6401(f)(2). And material qualifies as "'obscene'" if:

"(A) The average person applying contemporary community standards would find that the material or performance, taken as a whole, appeals to the prurient interest;

"(B) the average person applying contemporary community standards would find that the material or performance has patently offensive representations or descriptions of:

(i) Ultimate sexual acts, normal or perverted, actual or simulated, including sexual intercourse or sodomy; or

(ii) masturbation, excretory functions, sadomasochistic abuse or lewd exhibition of the genitals; and

"(C) taken as a whole, a reasonable person would find that the material or performance lacks serious literary, educational, artistic, political or scientific value."
K.S.A. 2021 Supp. 21-6401(f)(1).

The State does not dispute that Scheetz' conduct meets the statutory definition of this offense. Even so, since promoting obscenity to minors is not in K.S.A. 2021 Supp. 60-455(g)'s definitional listing of acts and offenses, the State alternatively argues that list is not intended to be exclusive. Reading this list as exemplary, the State claims the offense

18

of promoting obscenity to a minor should generally be considered an act or offense of sexual misconduct. It also alleges that evidence Scheetz offered to buy H.T. alcohol should likewise be considered since it claims this conduct constituted furnishing alcoholic beverages to a minor for illicit purposes under K.S.A. 2021 Supp. 21-5607(b). And it claims Scheetz' request that C.K. send him nude photos of her body and his offer to buy H.T. gas if she would "'come over and watch movies'" should also generally qualify.

Scheetz, on the other hand, contends K.S.A. 2021 Supp. 60-455(g) provides an exclusive definition which must be satisfied before the evidence is admissible under K.S.A. 2021 Supp. 60-455(d).

*Whether K.S.A. 2021 Supp. 60-455(g) should be read as an exemplary list, rather than an exclusive one*

Once again, K.S.A. 2021 Supp. 60-455(g) states:

"(g) As used in this section, an 'act or offense of sexual misconduct' includes:

(1) Any conduct proscribed by article 35 of chapter 21 of the Kansas Statutes Annotated, prior to their repeal, or article 55 of chapter 21 of the Kansas Statutes Annotated, or K.S.A. 2021 Supp. 21-6419 through 21-6422, and amendments thereto;

(2) the sexual gratification component of aggravated human trafficking, as described in K.S.A. 21-3447(a)(1)(B) or (a)(2), prior to its repeal, or K.S.A. 2021 Supp. 21-5426(b)(1)(B) or (b)(2), and amendments thereto;

(3) exposing another to a life threatening communicable disease, as described in K.S.A. 21-3435(a)(1), prior to its repeal, or K.S.A. 2021 Supp. 21-5424(a)(1), and amendments thereto;

(4) incest, as described in K.S.A. 21-3602, prior to its repeal, or K.S.A. 2021 Supp. 21-5604(a), and amendments thereto;

(5) aggravated incest, as described in K.S.A. 21-3603, prior to its repeal, or K.S.A. 2021 Supp. 21-5604(b), and amendments thereto;

19

(6) contact, without consent, between any part of the defendant's body or an object and the genitals, mouth or anus of the victim;

(7) contact, without consent, between the genitals, mouth or anus of the defendant and any part of the victim's body;

(8) deriving sexual pleasure or gratification from the infliction of death, bodily injury or physical pain to the victim;

(9) an attempt, solicitation or conspiracy to engage in conduct described in paragraphs (1) through (8); or

(10) any federal or other state conviction of an offense, or any violation of a city ordinance or county resolution, that would constitute an offense under article 35 of chapter 21 of the Kansas Statutes Annotated, prior to their repeal, or article 55 of chapter 21 of the Kansas Statutes Annotated, or K.S.A. 2021 Supp. 21-6419 through 21-6422, and amendments thereto, the sexual gratification component of aggravated human trafficking, as described in K.S.A. 21-3447(a)(1)(B) or (a)(2), prior to its repeal, or K.S.A. 2021 Supp. 21-5426(b)(1)(B) or (b)(2), and amendments thereto; incest, as described in K.S.A. 21-3602, prior to its repeal, or K.S.A. 2021 Supp. 21-5604(a), and amendments thereto; or aggravated incest, as described in K.S.A. 21-3603, prior to its repeal, or K.S.A. 2021 Supp. 21-5604(b), and amendments thereto, or involved conduct described in paragraphs (6) through (9)."

The State argues the Legislature's use of the word "includes" in the introductory sentence of this subsection signifies that the list of acts and offenses is meant to be read as exemplary, rather than exclusive. In support, the State relies on the fact that the Kansas Supreme Court has interpreted the use of the word "including" in K.S.A. 60-455(b), which lists material facts for which evidence of prior crimes or civil wrongs can be offered, as exemplary rather than exclusive. *State v. Gunby*, 282 Kan. 39, 56, 144 P.3d 647 (2006). It argues the words "includes" and "including" should be read the same way in the same statute. It also notes that since the Legislature enacted subsection (g) after *Gunby*, it used the word "includes" with full knowledge of and presumably acquiesced to *Gunby*'s interpretation. *State v. Kershaw*, 302 Kan. 772, 782, 359 P.3d 52 (2015); see also *State v. Quested*, 302 Kan. 262, 279, 352 P.3d 553 (2015) (acquiescence to appellate decisions may show legislative intent).

20

Scheetz argues the list in K.S.A. 2021 Supp. 60-455(g) should be read as exclusive, given the textual differences between the lists in subsections (b) and (g) and the scope of the exceptions to the rule against the use of evidence of prior crimes which subsections (b) and (d) each establish.

While we agree it is sensible to similarly construe the words "including" and "includes," particularly as used in the same statute, the language of K.S.A. 2021 Supp. 60-455 and the distinctions in the enacting backgrounds for the subsections at issue call for different interpretations.

*The State's reliance on Gunby is misplaced.*

K.S.A. 2021 Supp. 60-455(b) states that evidence that a person committed a crime or civil wrong on a specified occasion "is admissible when relevant to prove *some other material fact including* motive, opportunity, intent, preparation, plan, knowledge, identity or absence of mistake or accident." (Emphasis added.) The State correctly notes our Supreme Court has held the list of material facts provided after the word "including" was meant to be exemplary, not exclusive. *Gunby*, 282 Kan. at 53. But this holding was driven not by a textual analysis of the word "including," as the State's position suggests, but by a reading of the entire phrase "some other material fact including" against the backdrop of the common-law doctrine this statutory language was meant to codify. 282 Kan. at 53. In fact, the court did not comment on the use of the word "including" at all.

In its wholistic analysis of subsection (b) in *Gunby*, the court relied on the common-law background to the statute by outlining how prior crimes evidence was handled before the enactment of K.S.A. 60-455. The court noted that K.S.A. 60-455(b) did not change the common law substantially and simply codified the historical concept that evidence of other crimes or civil wrongs could be admitted for certain limited purposes. 282 Kan. at 51. At common law, evidence of other crimes or civil wrongs was

21

inadmissible for propensity purposes but could be admitted to prove certain other material facts, so long as a limiting instruction was given. Historically, this included proving relevant material facts other than the eight listed in subsection (b). The court thus found the text of subsection (b)—a statement that prior crimes evidence could be used to prove *some other material fact*, followed by eight examples of material facts—when read against the common-law doctrine codified by the statute, suggested the listed types of material facts were exemplary rather than exclusive. 282 Kan. at 50-53.

While the State is correct that the Legislature adopted subsection (g) after *Gunby* was issued, it was not enacted *because* of *Gunby.* Rather, subsection (d) and its definitional counterpart—subsection (g)—were enacted in response to another Kansas Supreme Court decision: *State v. Prine*, 287 Kan. 713, 200 P.3d 1 (2009) (*Prine I*); see *State v. Spear*, 297 Kan. 780, 787, 304 P.3d 1246 (2013). In *Prine I*, our Supreme Court found the district court erred in allowing the State to introduce evidence of Prine's prior sexual abuse of two young girls other than the victim under K.S.A. 60-455(b). Because it found this evidence prejudicial, it reversed Prine's convictions and remanded the case for a new trial. Soon after this decision, and before Prine's case was retried, the Legislature amended K.S.A. 60-455, adding subsections (d) and (g). *Spear*, 297 Kan. at 787 (citing L. 2009, ch. 103, § 12). On retrial, the propensity evidence was again admitted under K.S.A. 60-455(b) and Prine again appealed its admission. While the Supreme Court once more found the district court erred in admitting the evidence under (b), this time it found the error was not a reversible one since the evidence was now admissible under the new subsection (d). *State v. Prine*, 297 Kan. 460, 479-80, 303 P.3d 662 (2013) (*Prine II*).

Under these circumstances, it does not make sense to assume the Legislature intended K.S.A. 2021 Supp. 60-455(g) to be interpreted in line with *Gunby* based on the choice of the word "includes." Unlike K.S.A. 2021 Supp. 60-455(b), subsection (d) does not codify an exception to the rule against the use of prior crimes evidence that existed at common law in Kansas. Instead, it created a new class of evidence that was to be

22

completely exempt from the prohibition on propensity evidence—a prohibition that has historically been strictly enforced due to its highly prejudicial nature. *Prine II*, 297 Kan. at 475-76. As a result, we find *Gunby* provides no basis to infer that the Legislature intended to adopt a broader definition of an "act or offense of sexual misconduct" than what is given in the statute.

> *The lengthy and detailed definition of the general phrase "act or offense of sexual misconduct" in K.S.A. 2021 Supp. 60-455(g) suggests the list of acts and offenses is exclusive.*

The most fundamental rule of statutory construction is that courts must follow the Legislature's intent when it can be established. Appellate courts begin that search by looking at the statutory language. If that language is clear and unambiguous, the analysis stops there. Otherwise, the court must determine the Legislature's intent by consulting legislative history and employing traditional canons of statutory construction. *State v. Myers*, 314 Kan. 360, 364, 499 P.3d 1111 (2021). In doing so, courts may look to the historical background of the enactment, the circumstances attending its passage, the purpose to be accomplished, and the effect the statute may have under the various constructions suggested. *Prine II*, 297 Kan. at 475.

The text of K.S.A. 2021 Supp. 60-455(g) painstakingly defines the general phrase "act or offense of sexual misconduct" to include 21 specific criminal offenses and statutory schemes, along with precise descriptions of certain acts. Both the length and specificity of this list signal it is meant to be all-encompassing. *Premier Health Care Investments, LLC v. UHS of Anchor, L.P.*, 310 Ga. 32, 42-43, 849 S.E.2d 441 (2020) (noting the federal court practice of construing "'include' and its variants as a narrowing term when a variant of 'include' is followed by a list of several items, or when the items that follow 'include' are specific examples as opposed to general categories") (citing, e.g., *Carcieri v. Salazar*, 555 U.S. 379, 391-92, 129 S. Ct. 1058, 172 L. Ed. 2d 791 [2009] ["where Congress 'explicitly and comprehensively defined the term ("Indian") by

23

including only three discrete definitions,' it 'left no gap . . . for the agency to fill'"]); *Dong v. Smithsonian Inst.*, 125 F.3d 877, 879-80 (D.C. Cir. 1997) ("recognizing that '"includes" normally does not introduce an exhaustive list,' but concluding that 'includes' as used in the federal Privacy Act was a limiting term where the Act provided that the term 'agency' 'includes' multiple specified categories without any 'general principle in sight'"). To hold otherwise would render the Legislature's detailed listing superfluous.

While the State does not make this argument, we recognize that typically courts interpret the words "includes" and "including" when used along with a list to signify that the list is exemplary rather than exclusive. See *State v. Jefferson*, 287 Kan. 28, 37, 194 P.3d 557 (2008); see also K.S.A. 2021 Supp. 60-208(c) (list of affirmative defenses "including" not exclusive, although 17 items, each briefly stated). But we also recognize this practice is not universal and context is key. *Schmidt v. Mt. Angel Abbey*, 347 Or. 389, 410, 223 P.3d 399 (2009) (Walters, J., concurring) ("Examples serve no right or wrong purpose, and the legislature may use examples in one statute to establish limits on an ambiguous term, and in another to illustrate or expand."); *Premier Health Care Investments, LLC*, 310 Ga. at 40-41 (recognizing the meaning of the word "includes" can be either exhaustive or illustrative depending on "'the context, the subject matter, and legislative intent'"); *Mitchell v. University of Montana*, 240 Mont. 261, 265, 783 P.2d 1337 (1989) ("includes" construed as exclusive using the *expressio unius est exclusio alterius* maxim of statutory construction and as consistent with the practice of narrowly construing government immunity statutes generally). Therefore, in this context, we interpret the itemization the Legislature set forth in K.S.A. 2021 Supp. 60-455(g) to be the universe of items which qualify as an "act or offense of sexual misconduct" as that term is used in K.S.A. 2021 Supp. 60-455(d).

We also note the difference in the terms modified by the words "including" and "includes" in the respective subsections. K.S.A. 2021 Supp. 60-455(b) allows admission of the evidence "when relevant to prove *some other material fact including* motive,

opportunity, intent, preparation, plan, knowledge, identity or absence of mistake or accident." (Emphasis added.) The term "material fact" has a recognized legal definition independent of the statute. See *Timi v. Prescott State Bank*, 220 Kan. 377, 389, 553 P.2d 315 (1976) (in the context of a fraudulent misrepresentation case, finding "[a] fact is material if it is one to which a reasonable person would attach importance in determining his choice of action in the transaction involved"); *Unified Gov't of Wyandotte County v. Trans World Transp. Svcs.*, 43 Kan. App. 2d 487, 490, 227 P.3d 992 (2010) (noting in the context of summary judgment, "[i]ssues of fact are not material unless they have legal controlling force as to the controlling issue"). Thus, the Legislature could have determined an explicit, exclusive, definition of what qualified as a "material fact" was unnecessary.

K.S.A. 2021 Supp. 60-455(g), on the other hand, does not rely on terms with an existing definition outside the statute. Rather than listing a general term with a widely accepted existing definition followed by eight other terms recognized at common law as examples of the former, subsection (g) provides a specific definition for a statutory term. Subsection (g) states that "[a]s used in this section, an 'act or offense of sexual misconduct' includes"—followed by a list of 21 specific acts and criminal offenses. The term "act or offense of sexual misconduct," unlike the term "material fact," does not have a common legal definition independent of the one given by K.S.A. 2021 Supp. 60-455(g).

Furthermore, as Scheetz notes, K.S.A. 2021 Supp. 60-455(b) and (d) differ in terms of the scope of the exception to the rule against the use of other crimes evidence they establish.

K.S.A. 2021 Supp. 60-455(a) establishes a general prohibition against the use of evidence of other crimes to establish a defendant's propensity to commit the alleged crime at hand. This rule is based on the long-standing principle that such evidence is

25

irrelevant and unduly prejudicial and has historically been strictly enforced. *Prine II*, 297 Kan. at 475-76.

K.S.A. 2021 Supp. 60-455(b) creates a narrow exception to the rule against the use of evidence of other crimes, allowing the use of such evidence to prove some material fact at issue other than propensity. Additionally, when evidence of other crimes is admitted under this exception, the district court must give a limiting instruction to ensure the jury does not consider the evidence for propensity purposes. *Prine II*, 297 Kan. at 478-79.

On the other hand, the Legislature created a total exception to the rule against the admission of other crimes evidence in K.S.A. 2021 Supp. 60-455(d). Under this exception, evidence of a defendant's other crimes may be admitted for any purpose, including propensity. Accordingly, no limiting instruction is necessary. *Prine II*, 297 Kan. at 478-79. The only limit the Legislature placed on the use of other crimes evidence under subsection (d) is that the criminal conduct must qualify as an "act or offense of sexual misconduct." Given the historical practice of strict enforcement of the rule against the admission of propensity evidence, Scheetz persuasively argues that the Legislature intended this exception to be narrowly construed. And reading the list of acts and offenses in subsection (g)'s definition of that term as nonexclusive would seemingly remove the only limit the Legislature has placed on this exception.

We find that interpreting the list as exclusive gives meaning to the exception carved out by the Legislature to the general prohibition on the use of propensity evidence. And it recognizes the Legislature's authority to craft such an exception. If the Legislature wished this list to be interpreted expansively, it could have so instructed. See, e.g., K.S.A. 2021 Supp. 21-6815(c)(1) (outlining the "nonexclusive list of mitigating factors [which] may be considered in determining whether substantial and compelling reasons for a departure exist"); K.S.A. 2021 Supp. 50-626(b) ("Deceptive acts and practices" under the

Kansas Consumer Protection Act "include, but are not limited to," the listed items.). Or it could have specified that "comparable" acts or offenses also qualified. See, e.g., K.S.A. 2021 Supp. 22-4902(b)(9), (c)(17), (e)(3), (f)(2) (convictions of a "comparable" offense to those listed in the definitions of "'[s]ex offender,'" "'[s]exually violent crime,'" "'[v]iolent offender,'" and "'[d]rug offender'" can require one to register under the Kansas Offender Registration Act). It did not. On the other hand, interpreting this specific list as merely illustrative would usurp the Legislature's exclusive authority by allowing courts, and not the Legislature, to determine what items satisfy the statutory definition of "an act or offense of sexual misconduct" as that term is used in K.S.A. 2021 Supp. 60-455. This term should be legislatively and not judicially defined.

This point is exemplified by the State's failure to provide a working definition if K.S.A. 2021 Supp. 60-455(g)'s list of acts and offenses is to be read as exemplary. Nor does the State provide any suggestion on how to apply its interpretation of the statute. Although the State identifies several offenses not in subsection (g)'s list that it claims qualify as acts or offenses of sexual misconduct if the list is read as nonexclusive, it does not identify what definition of the term it is applying to reach its conclusions. If we adopted the State's proposition, there would be no guidance in determining whether acts or offenses qualified as "sexual misconduct," and such qualification could then turn on subjective opinions and concerns. Such a ruling would undermine jurisprudential values of fairness and predictability within the law. *Franklin v. First Money, Inc.*, 427 F. Supp. 66, 70 (E.D. La. 1976) ("Predictability of judicial interpretation of the laws is desirable because citizens must abide by those laws and should not have to guess their meaning.").

*The legislative history of K.S.A. 60-455(g) and a canon of statutory construction both support reading the list of acts and offenses as exclusive.*

While we do not find the language to be ambiguous, a review of the legislative history and application of a well-accepted canon of statutory construction supports our interpretation.

First, we agree with Scheetz that the level of detail in subsection (g)'s definition justifies application of the *expressio unius est exclusio alterius* canon of construction. Under this maxim, which roughly translates as "the inclusion of one thing implies the exclusion of another," when an item is not in a specific list, a court can presume that the Legislature intended to exclude it. *Cole v. Mayans*, 276 Kan. 866, 878, 80 P.3d 384 (2003). And, as Scheetz points out, reading the definition in K.S.A. 2021 Supp. 60-455(g) as exclusive makes sense given the differing level of detail between that subsection and K.S.A. 2021 Supp. 60-455(b). Subsection (g)'s list of 21 acts and offenses is much more comprehensive than subsection (b)'s list of 8 general terms, describing each qualifying act or citing specific sections of the criminal code.

The legislative history of K.S.A. 2021 Supp. 60-455(g) also supports reading its definition as exclusive rather than exemplary. As the enacting legislation made its way through the committee process, it was amended, modifying the list of offenses in the definition of an "act or offense of sexual misconduct."

For example, as part of its review of the bill, the House Judiciary Committee extended the list to include four other criminal offenses: (1) the sexual gratification component of aggravated human trafficking; (2) exposing another to a life threatening communicable disease; (3) incest; and (4) aggravated incest. It also changed the existing acts or offenses in the definition. H.B. 2250 (February 16, 2009), as amended by House Committee on Judiciary, p. 2.

28

The original version of the bill included "contact, without consent, between any part of the defendant's body or an object and the genitals and anus of another person" and "contact, without consent, between the genitals and anus of the defendant and any part of another person's body" under the definition of an "'act or offense of sexual misconduct.'" H.B. 2250 (February 4, 2009), as amended by House Committee on Judiciary, pp. 1-2. The language of both these categories of conduct was changed to "the genitals, mouth or anus of the victim" and "the genitals, mouth or anus of the defendant." H.B. 2250 (February 16, 2009), as amended by House Committee on Judiciary, p. 2. Furthermore, the final catch-all category in the list, "an attempt or conspiracy to engage in conduct described [above]," was changed to include "an attempt, solicitation or conspiracy to engage." H.B. 2250 (February 4, 2009), as amended by House Committee on Judiciary, p. 2; H.B. 2250 (February 16, 2009), as amended by House Committee on Judiciary, p. 2.

These amendments show that the Legislature intended the list of acts and offenses in subsection (g) to be exclusive. If the list of offenses was merely exemplary, as the State suggests, the House Judiciary Committee would have had no need to carefully adjust the list of offenses in the definition. In particular, if the provision including unconsented contact between the defendant's body and the victim's genitals and anus was meant as exemplary, there would be no need to amend the language to include unconsented contact with the victim's mouth. That the defendant engaged in unconsented sexual contact with the victim's body would seemingly be enough to construe the contact as already in the definition.

For these reasons, we find the statutory definition provided in K.S.A. 2021 Supp. 60-455(g) is meant to be exclusive. And since we also find none of the propensity evidence admitted by the State falls under this definition, the district court erred in admitting it under K.S.A. 2021 Supp. 60-455(d). This evidence should have been excluded under K.S.A. 2021 Supp. 60-455(a)'s general prohibition on the admission of such evidence.

29

But we stop short of finding the district court's error in admitting the propensity evidence under K.S.A. 2021 Supp. 60-455(d), standing alone, constituted reversible error entitling Scheetz to a new trial. Instead, we reserve our final ruling on this subject until we address Scheetz' claim that he was denied a fair trial based on cumulative error.

*Evidence of Scheetz' internet search history was irrelevant and inadmissible.*

The State moved in limine to admit Scheetz' internet search history as propensity evidence under K.S.A. 2021 Supp. 60-455(d), and that is the avenue under which the district court admitted it.

Scheetz challenged this admission below by noting there was no evidence he had watched child pornography and nothing in the search history was illegal. Scheetz correctly notes that K.S.A. 2021 Supp. 60-455(g) does not designate the possession of pornography as an act of sexual misconduct unless the pornographic material is child pornography. And because his search history only shows that he accessed written content and pornographic videos of adult actors, Scheetz argues there was nothing in his search history that qualified as child pornography. See K.S.A. 2021 Supp. 21-5510(a)(2) (criminalizing possession of "visual depiction of a child under 18 years of age shown or heard engaging in sexually explicit conduct").

The State makes no argument that Scheetz' internet search history qualifies as an act or offense of sexual misconduct as defined in K.S.A. 2021 Supp. 60-455(g). Instead, the State claims that Scheetz did not preserve this argument for review with a timely objection. For the reasons laid out previously, the State's arguments about preservation lack merit.

The State argues on appeal that the district court did not err in admitting evidence of Scheetz' internet search history because it was relevant and not unduly prejudicial.

30

Unless prohibited by statute, constitutional provision, or court decision, all relevant evidence is admissible. K.S.A. 60-407(f). Evidence is relevant if it has any tendency in reason to prove any material fact. K.S.A. 60-401(b). To establish relevance, there must be some material or logical connection between the asserted facts and the inference or result they are intended to establish. *Gunby*, 282 Kan. at 47.

The State seemingly urges this panel to adopt the district court's finding that this evidence was relevant to show Scheetz' "sexual attraction to young girls . . . and his sexual attraction for stepfather-stepdaughter or other type[s] of incestuous sexual contact."

As Scheetz notes, however, both the Kansas Supreme Court and our court have repeatedly held that the possession of pornography is irrelevant to show an individual's propensity to engage in the sort of behavior depicted in the pornography. See *State v. Smith*, 299 Kan. 962, 976, 327 P.3d 441 (2014); *State v. Boleyn*, 297 Kan. 610, 624-27, 303 P.3d 680 (2013); *State v. Ewing*, No. 118,343, 2019 WL 1413962, at *23 (Kan. App. 2019) (unpublished opinion).

In *Boleyn*, the court held that evidence that Boleyn possessed homosexual pornography was not probative to rebut or impeach his claim of not being gay. 297 Kan. 626-27. The court cautioned against assuming a defendant has a propensity to engage in certain conduct based on their possession of certain pornography, noting:

> "'[T]he central function of pornography is the creation or enhancement of sexual fantasy and/or arousal. That is, it presents bodies, behaviors, and situations in a way that is intended to sexually inspire or excite the viewer, *regardless of whether such bodies, behaviors, and situations would be available or even desirable for the viewer to experience in real life*.'" *Boleyn*, 297 Kan. at 627 (quoting Weinberg, Williams, Kleiner & Irizarry, *Pornography, Normalization, and Empowerment*, 39 Arch. of Sex. Behav. 1389, 1391 [2012]).

31

In *Smith*, the court reached the same conclusion in slightly different circumstances. There, the State sought to introduce evidence of the defendant's possession of heterosexual pornography to prove the defendant had lied in testifying he was gay. The court once again held the pornography was irrelevant to show the defendant's sexual practices. 299 Kan. at 976. The court compared the case to *Boleyn*, noting that it had already "cautioned against inferring too much about a person's actual sexual practices from the pornography he or she possesses." *Smith*, 299 Kan. at 976. Explaining its ruling, the court remarked "[i]f possession of homosexual pornography is not relevant to prove a person's sexual practices, then possession of heterosexual pornography is likewise not relevant for that purpose." 299 Kan. at 976.

In *Ewing*, evidence of a defendant's internet search history showing he had accessed violent pornography, along with selected clips of the videos themselves, were admitted as propensity evidence at trial. It was not admitted under K.S.A. 60-455 but as relevant evidence which the district court determined was not unduly prejudicial. Our court found the district court erred in admitting this evidence, noting several problems with its probative value. 2019 WL 1413962, at *24.

First, the internet search history was admitted with no evidence showing that Ewing viewed the video footage depicted, since his search history merely showed that he accessed the videos and provided no indication as to which portions of the videos he watched. "Thus, even if the State's rationale [was] sound—that the viewing of violent pornography is relevant to showing that an individual committed acts like those depicted therein—there simply [was] no evidence that Ewing viewed the portions of the videos containing acts like those of which he was accused." *Ewing*, 2019 WL 1413962, at *23. This problem was made worse by the lack of expert testimony on the correlation between men who consume violent pornography and men who engage in violent sexual acts with women. "[W]ithout evidence showing that a person viewing violent pornography has an increased likelihood to commit violent sex crimes, [the evidence] had little, if any,

32

probative value about whether Ewing committed the violent sex crimes charged." 2019 WL 1413962, at *23.

The panel in *Ewing* also cited two other bases in concluding the district court had erred in admitting the evidence: (1) one of the pornographic videos was entitled "'Autism Abuse,'" even though there was no evidence that any of the victims in the case were autistic and (2) the district court admitted it never viewed the evidence before allowing the jury to see it, so it could not possibly have weighed the probative value of the evidence against its potential for undue prejudice. *Ewing*, 2019 WL 1413962, at *24.

The State makes a brief attempt to distinguish these cases but avoids addressing their core holding that a defendant's possession or consumption of pornography is not relevant to show that the defendant was more likely to commit the acts portrayed in the pornography. We find the district court erred in determining Scheetz' internet search history was relevant to show his propensity to engage in sexual acts with underage girls.

Both *Smith* and *Boleyn* instructed that a person's pornographic preferences are irrelevant towards determining their real-life sexual preferences. And the problems with search history evidence highlighted in *Ewing* are just as applicable here. While the State presented evidence of Scheetz' search history, this evidence provides no indication as to how long Scheetz accessed these webpages or whether he even watched the videos they contain. Furthermore, as Scheetz points out, many of the searches have no apparent relation to the charges here, including, for example, searches for adult sex toys and searches related to sibling incest. As Scheetz points out, there was no information provided as to what these videos depicted apart from the titles, leaving the jury to speculate about their actual content. Finally, there was no expert testimony to support a correlation between this evidence and Scheetz' alleged propensity to commit the crimes with which he was charged.

33

Accordingly, we find the evidence of Scheetz' internet search history was irrelevant to prove his propensity to commit the charged crimes. Because this evidence was irrelevant, there is no need to weigh its probative value against its potential for undue prejudice. But as with the admission of the other propensity evidence under K.S.A. 2021 Supp. 60-455(d), we do not decide whether the admission of Scheetz' internet search history, standing alone, constituted reversible error entitling Scheetz to a new trial. Instead, we also reserve our final ruling on this subject until we address Scheetz' claim that he was denied a fair trial based on cumulative error.

*Did the prosecutor's comments during closing arguments constitute prosecutorial error?*

Scheetz next argues the prosecutor erred by misstating the evidence and law and by presenting an argument designed to inflame the passions of the jury during closing argument. The State counters that the prosecutor's comments were proper and any error was harmless.

Scheetz concedes that he did not object to the prosecutor's comments at trial and makes these arguments for the first time on appeal. But he correctly argues we may still consider his claim because a contemporaneous objection is not generally required to preserve issues of prosecutorial misconduct during closing argument. *State v. Sean*, 306 Kan. 963, 974, 399 P.3d 168 (2017). A prosecutor's comments made during voir dire, opening statement, or closing argument are reviewable based on prosecutorial error even without a timely objection, although the presence or absence of an objection may figure into the court's analysis of the alleged misconduct. 306 Kan. at 974.

Appellate courts employ a two-step process to evaluate claims of prosecutorial error, examining the existence of error and prejudice. To determine whether prosecutorial error has occurred, the appellate court must decide whether the challenged conduct falls outside the wide latitude afforded prosecutors. If error is found, the appellate court must

next determine whether the error prejudiced the defendant's due process rights to a fair trial. In evaluating prejudice, we adopt the traditional constitutional harmlessness inquiry demanded by *Chapman v. California*, 386 U.S. 18, 24, 87 S. Ct. 824, 17 L. Ed. 2d 705 (1967). Under this standard, prosecutorial error is harmless if the State can show beyond a reasonable doubt that the error complained of will not or did not affect the outcome of the trial considering the entire record—in other words, where there is no reasonable possibility that the error contributed to the verdict. *State v. Sherman*, 305 Kan. 88, 109, 378 P.3d 1060 (2016).

A criminal defendant can establish the first prong by showing the prosecutor misstated the law or argued a fact or factual inferences with no evidentiary foundation. *State v. Moore*, 311 Kan. 1019, 1040, 469 P.3d 648 (2020). And a prosecutor may err by misstating the law through implication. See *State v. Jones*, 298 Kan. 324, 336, 311 P.3d 1125 (2013). A defendant can also establish prosecutorial error by showing the prosecutor made an argument intended to inflame the jury's passions or prejudices or made an argument that diverted the jury's attention from its duty to decide the case on the evidence and controlling law. *State v. Adams*, 292 Kan. 60, 67, 253 P.3d 5 (2011).

On the other hand, while a prosecutor may not misstate the facts in evidence, a prosecutor may draw reasonable inferences from the evidence and is given latitude in drawing those inferences. *State v. Stano*, 284 Kan. 126, 151, 159 P.3d 931 (2007).

Scheetz claims the prosecutor:  (1) misstated the evidence; (2) misstated the law; and (3) made an argument designed to inflame the jury's passions. Each of these claims is analyzed in turn.

*Whether the prosecutor misstated the evidence*

Scheetz first argues the prosecutor misstated the evidence, exacerbating the prejudicial impact of the inadmissible propensity evidence. Scheetz claims the prosecutor argued facts with no evidentiary foundation by: (1) stating the photo G.H. received was of Scheetz' *erect* penis and (2) stating that after B.C. spoke with Assistant Chief Enfield about H.T.'s statement, he began to think Scheetz sent the photo to G.H. intentionally.

As to his first claim, Scheetz points out that G.H. did not describe the penis in the picture she received as erect in either her trial testimony or the statement she gave to police. The State counters that while there was no direct evidence that the picture was of an erect penis, this was a reasonable inference based on the accompanying text.

G.H. described the picture as including text that said: "Not much just waiting for you to come over." And Undersheriff Diercks testified that he and B.C. first concluded that Scheetz' transmission of the picture to G.H. was an accident and that Scheetz was possibly trying to send the picture to his girlfriend instead, based on the way Snapchat functions.

While prosecutors enjoy latitude in making closing arguments, their arguments must fit the evidence presented at trial. There was no evidence the penis in the photo sent to G.H. was erect, so the State's characterization of it as such was in error and arguably made to inflame the passions of the jury, which is also error. See *Ewing*, 2019 WL 1413962, at *35-36 (finding closing arguments lacked evidentiary basis and were speculation made to inflame the passions of the jury); see also *State v. Logan*, No. 123,151, 2022 WL 1592702, at *3-4 (Kan. App. 2022) (unpublished opinion) (prosecutor characterization of revolver as single action [requiring cocking separately from pulling trigger] rather than double action [pulling trigger cocks and fires gun] with no evidence on the point was error, albeit harmless).

36

We also agree with Scheetz that the prosecutor further misstated the evidence during closing argument by stating that after B.C. spoke with Assistant Chief Enfield about H.T.'s statement, he began to think Scheetz sent the photo to G.H. intentionally. None of the witnesses testified that they believed Scheetz intentionally sent the photo to G.H., including her father, B.C.

Undersheriff Diercks testified that he and B.C. both believed Scheetz' transmission of a nude picture to G.H. was an accident. But Diercks stated that after learning from Officer Enfield that Scheetz was possibly exchanging inappropriate Snapchat messages with a 16-year-old girl, they decided to contact the KBI. He testified the reason they decided to do this was that they became suspicious the picture Scheetz sent to G.H. may have been intended for this 16-year-old girl and they knew he was working as a school resource officer in a high school. On cross-examination, Diercks confirmed that neither he, B.C., nor G.H. believed that Scheetz intended to send the picture to G.H.

The State offers a vague description of the above testimony, notably omitting any reference to Diercks' statement that he and B.C. decided to contact the KBI because they became suspicious the picture Scheetz sent to G.H. may have been intended for the 16-year-old girl who was the focus of Officer Enfield's investigation. Rather than confront this evidence, the State claims that it "could argue" the prosecutor's statement that Scheetz sent the photo to G.H. on purpose was a reasonable inference. We disagree and find Scheetz has established error on this claim as well.

*Whether the prosecutor misstated the law*

Scheetz next claims the prosecutor misstated the law by describing H.T. and C.K. as "underage," as this implied they were under the age of consent set by Kansas' statutory rape law. Scheetz points out the age of consent in Kansas is 16 and both H.T. and C.K. were 16 when he allegedly sent the nude pictures.

37

The State counters that the prosecutor never mentioned the term "statutory rape" in closing argument. And, the State claims, commenting on C.K.'s age was proper as Scheetz was charged with sexual exploitation of a child (M.C.) and one of the required elements of that offense is that the victim be less than 18 years old.

The State's argument that commenting on C.K.'s age was proper because Scheetz was charged with sexual exploitation of a child is not persuasive. While the State is correct that sexual exploitation of a child requires the victim to be under 18 years old, Scheetz was not charged with sexual exploitation of C.K., but of M.C. There was thus no need for the prosecutor to mention C.K.'s age to prove that Scheetz had committed this offense. Additionally, this argument, even if we accepted it, does not explain why the prosecutor needed to comment on H.T.'s age.

The State also does not explain how the fact that the prosecutor did not use the words "statutory rape" impacts whether the description of C.K. and H.T. as underage was a misstatement of law. But we find its argument that the prosecutor was not referring to the age of consent and was instead referring to some other age requirement under Kansas law persuasive. While C.K. and H.T. were not underage as it pertains to the age of consent in Kansas, they were underage as it pertains to Scheetz' alleged transmission of nude pictures. Although the age of consent is 16, K.S.A. 2021 Supp. 21-6401(b) criminalizes promoting obscenity to anyone under the age of 18 years. Given that the prosecutor was discussing Scheetz' alleged transmission of nude photos to C.K. and H.T. when she mentioned the girls were underage, it seems more likely that this is what the prosecutor was referring to.

Since C.K. and H.T. were "underage" as it pertains to the legality of Scheetz' alleged transmission of nude pictures to them, we find the prosecutor did not misstate the law by describing them as such.

38

*Whether the prosecutor made an argument designed to inflame the passions of the jury*

Last, Scheetz claims the prosecutor made an argument designed to inflame the passions of the jury by arguing to the jury that nobody in M.C.'s life cared about her. Scheetz argues that M.C.'s difficult upbringing bears no relevance to the crimes he was charged with, and the prosecutor's statement sought to have sympathy play an undue role in the verdict. The State argues that the prosecutor's comments accurately reflected the evidence and were within the wide latitude afforded to prosecutors in describing the evidence.

Scheetz has failed to show error on this point. In making this statement, the prosecutor was describing why M.C. waited so long to divulge Scheetz' actions. According to the prosecutor, M.C. had not reported the abuse earlier because, until then, no one in her environment had tried to help her, despite the plain evidence of her mother's abuse. Given the context of the statement, we find it was within the wide latitude granted to prosecutors in describing the facts.

*Reversibility*

We find the prosecutor erred in describing Scheetz' penis as erect in the picture sent to G.H. and in stating that the witnesses concluded Scheetz sent the picture to G.H. intentionally. But the errors amounted to isolated and comparatively minor misstatements that were insufficiently prejudicial to compromise Scheetz' fundamental right to a fair trial given the admissible evidence pointing to his guilt. Defense counsel's failure to object to these statements also supports this conclusion. See, e.g., *State v. Lowery*, 308 Kan. 1183, 1211-12, 427 P.3d 865 (2018) (strength of the evidence and the lack of objection justified finding that isolated errors in closing statements did not deprive defendant of fair trial). Nonetheless, they factor into Scheetz' claim of cumulative error, and we consider them for that purpose.

39

*Do the trial errors cumulatively support reversal?*

Finally, Scheetz claims that the totality of errors here cumulatively prejudiced him and denied him his right to a fair trial. We agree.

This court uses a de novo standard when determining whether the totality of circumstances substantially prejudiced a defendant and denied the defendant a fair trial based on cumulative error. *State v. Brown*, 298 Kan. 1040, 1056, 318 P.3d 1005 (2014). Yet "'if any of the errors being aggregated are constitutional in nature, the cumulative error must be harmless beyond a reasonable doubt.'" *Ewing*, 2019 WL 1413962, at *39 (quoting *State v. Robinson*, 306 Kan. 1012, 1034, 399 P.3d 194 [2017]). Here, some errors Scheetz asks us to accumulate are constitutional, so we must apply the constitutional harmless error standard. This means the State must prove there is "no 'reasonable possibility'" the errors contributed to the verdict. *State v. Berkstresser*, 316 Kan. 597, 606, 520 P.3d 718 (2022) (distinguishing constitutional and nonconstitutional harmless error tests).

Several relevant factors help show "'whether errors were cumulatively harmful, including the effectiveness of any remedial efforts by the district court at the time the error arose; the nature and number of errors committed and their interrelationship, if any; and the strength of the evidence.'" *Ewing*, 2019 WL 1413962, at *39 (quoting *Lowery*, 308 Kan. at 1243).

Here, as in *Ewing*, we identified several serious errors committed by the district court in admitting the propensity evidence at trial. We also identified two less significant errors by the prosecutor in closing arguments. And, as Scheetz notes, these errors compounded upon themselves. The State relied heavily on inadmissible propensity evidence (which was highly prejudicial) in building its case. It then misstated portions of this evidence in its closing arguments, exaggerating its prejudicial effect. Given the

40

quantity of the propensity evidence admitted and the emphasis placed upon it by the State, both throughout the trial and during opening statements and closing arguments, we cannot say there is no reasonable possibility the errors contributed to the outcome.

The sheer volume of the propensity evidence admitted by the district court reveals the significant role this evidence played in the State's case. This evidence included the testimony of nine witnesses (including the alleged victims and some of their parents), records of G.H.'s text messages with her father, G.H.'s written statement to investigators, Facebook messages between Scheetz and C.K., and over 30 pages, printed in small font, of Snapchat messages between Scheetz, G.H., C.K., and H.T. And rather than including one or two representative examples of the pornography, the State introduced close to 60 pages of mostly graphic and inflammatory search terms. In fact, the amount of propensity evidence was vastly disproportionate to the amount of evidence directly related to the crimes Scheetz was charged with.

The importance of the propensity evidence to the State's theory at trial is plain by the way it was used in the State's opening and closing arguments. The State bookended its case by referencing the propensity evidence, starting its case with a description of Scheetz' alleged conduct with G.H., H.T., and C.K. and ended its case by telling the jury they could tell what type of person he was and infer his guilt based on this evidence. The State sought to support M.C.'s credibility by casting her revelation of Scheetz' abuse as the endpoint of a widespread investigation into Scheetz' improper conduct with other young women. And the State directly tied its theory for the case to the propensity evidence admitted at trial, instructing the jury at the end of the trial that it could tell what type of person Scheetz was and could dismiss any question about his guilt based on his internet search history and his past conduct with G.H., H.T., and C.K.

Finally, the State amplified the prejudicial effect of the search history evidence, highlighting a list of the entries most likely to offend the jury as part of its closing

41

arguments. And it reinforced this prejudice by misdescribing other propensity evidence in those arguments.

While the evidence against Scheetz was substantial, the district court took no efforts to mitigate the prejudicial effect of these errors. Although there was physical evidence supporting the convictions on counts 5 and 6, there was no direct physical evidence on counts 1 through 4. The jury was largely asked to weigh the competing testimony of M.C. and Scheetz, and the State relied heavily on the propensity evidence to attack Scheetz' credibility.

The inherent dangers of admitting propensity evidence include a jury's desire to punish the defendant for that wrongdoing regardless of the evidence bearing on the charged crimes and a diminution of the defendant's credibility as a chronic wrongdoer. Another danger is convicting a defendant to punish him or her for a propensity to violate the law or giving the propensity evidence too much weight. See *State v. Boggs*, 287 Kan. 298, 305, 197 P.3d 441 (2008). All these dangers would be in play here, which supports recognizing the impact this evidence likely had on the verdict.

Accordingly, we cannot say beyond a reasonable doubt that the impermissible evidence and improper comments did not cumulatively impact the verdict. As we explained in *Ewing*, this is not a decision we make lightly, especially given the seriousness of the charges. And this finding is in no way a comment on the credibility of the alleged victims, either M.C. or any of the other girls. But the Constitution guarantees Scheetz the right to a fair trial, and we find the cumulative effect of the errors committed by the district court and prosecutor denied Scheetz this constitutional right. Thus, we are compelled to reverse Scheetz' convictions and remand this case to the district court to conduct a new trial.

Reversed and remanded with directions.